Good morning, Your Honor. I believe it's still morning. My name is Robert Hill, and I and Mr. Hatfield are here on behalf of Marion Fowler, who is not only the guardian for Jeffrey Vanderhaal, but is also the assignee of Priscilla Ford and Maurice Wilson, who are State Farm's insurers. Can I stop you there? Yes, sir. So you allege in the complaint in paragraphs three and elsewhere that you were assigned Wilson and Ford's rights. Yes, sir. What is that assignment based on? The assignments are actually in the record, Your Honor. And is that Exhibit H? If you give me one second, I will... The settlement agreement? There were two sets of settlement agreements. One for the Wilson and Ford settlement agreement were in the record at 437 to 448 of the record. I apologize. I didn't know that more carefully. But those are the records from Wilson and Ford to Mr. Fowler as the guardian. They were directly there. Now, that was the assignment that was made. There was an assignment from Priscilla Ford, who was the named insured on the State Farm policy, before we got the assignment from Mr. Wilson. The assignment from Mr. Wilson to Mr. Fowler was made the day the case was tried against Mr. Wilson. So there are two different assignments. Correct. There's a second settlement agreement, is what you're saying. Yes, sir. There was one settlement agreement that was later avoided, which was the settlement agreement with Mr. Vanderhall without a guardian. And there was a second set of settlement agreements with Mr. Fowler as Mr. Vanderhall's guardian. And that was the 437 to 448 in the record of those sets of assignments. Thank you for clearing that up. And that's what gets us here. In the midst of all this, this got pitched as a battle between State Farm and Mr. Hatfield. And I'd like to spend a little bit of time talking about this case from Wilson and Ford's perspective. In 2011, Wilson and Ford were sued for catastrophic injuries that Mr. Vanderhall suffered. He was wounded, quadriplegic. In 2012, Wilson and Ford sent State Farm, their insurance company, a copy of the life care plan that Mr. Hatfield had produced. And that's on page 57 of the record I would like to direct your attention to, because that life care plan states that Mr. Vanderhall had a medical history of mental retardation, secondary to a brain injury at birth. That was in State Farm's files, actual knowledge that they had. In August of 2013, Wilson and Ford sent State Farm, their insurance company, a copy of a proposal, a proposed settlement that they were working out with Mr. Vanderhall, which indicated that the settlement was going to be without a guardian and without court approval. So as of August 13th, State Farm knew two different things. They knew that Mr. Vanderhall had been diagnosed as mentally retarded, secondary to an injury at birth, and they knew that we were proposing to settle, we being Wilson and Ford, their insurance were proposing to settle without a guardian, without court approval. Now, at that point, they could have asked their defense counsel to send out this basic discovery, an interrogatory. Has Mr. Vanderhall ever been diagnosed or has there been any mental evaluations or assessments relating to this mental retardation since birth? Who did it, what, where, when? Where are the records? Send us the production request, send us the records. Had they done that, they would have turned up these school records, and the school records were referenced both in the state court order setting aside the first settlement and by Judge Gergel in the district court order, where the district court order under appeal even noted that our doctor, Dr. Sanders, who opined that Mr. Vanderhall had been incapacitated since childhood or shortly thereafter, was consistent with his school records. Now, those school records indicated that he had extremely low intellectual functioning over a series of testing done when he was at age 5, 8, and 11. So what do we do about the lawyer who represents his client's conduct all the way through? I mean, he obviously had to know what his records were. He stands up in front of a state court and a federal district court and says he's competent. Your Honor, Mr. Hadfield did an affidavit, a mea culpa. He should have investigated that sooner. But in fairness to Mr. Hadfield, he did not have those school records. What he had was the mental diagnosis of retardation since birth. And on that point, we agree with State Farm that there's varying degrees of mental retardation, there's varying degrees of capacity. We didn't get the school records talking about that extremely low functioning until later on when we had actually hired him, Dr. Sanders, to investigate. There were also the implied representations. I agree, Your Honor, up to the point. I get to apologize for the representations made to this court in the first appeal. I was the one that drafted that brief. And I could have been much clearer that what I was saying was as an advocate assessing the evidence. I never meant to be a witness as to his competency. And that's the distinction between that Rule 3.7 of our professional rules in South Carolina draws between an advocate acting as an advocate and an advocate acting as a witness. I could have been clearer that that was an assessment of the evidence that we had at the time. We did not get the investigation admittedly that we should have done earlier until later. Now, it would be a different circumstance had we acted fraudulently. Or had those representations been relied on by the court. Because if we'd have had that, we'd have had flat-out judicial estoppel and we wouldn't be here right now. But neither one of those occurred. Now, State Farm's aware of the judicial estoppel doctrine. They alleged it in their answer as an affirmative defense. But they never asserted that we were judicially estopped for taking these inconsistent positions because they're really not inconsistent. We had an assessment of the evidence before we had his mental health investigated, evaluated, and then after. And we should have done it sooner. But I'm here again as Wilson and Ford, the astonisher on the insurers. Wilson and Ford's problem is not that Mr. Hatfield misrepresented Mr. Vanderhall's competency. Our problem is that Mr. Hatfield fixed it. When he did have the investigation done, he went to the state court, presented it to the state court. The state court looked at it, gave Wilson and Ford an opportunity to weigh in. State Farm was actually present at that same hearing. And at that change, the state court found that the initial settlement was void. And that voidness differs, I think, South Carolina law from some other law because that's a two-way ratchet. Had nobody investigated and we would have taken Mr. Vanderhall, would have taken Wilson and Ford to a trial and gotten a $75 million verdict, they could have then come in and said, no, wait a minute, Mr. Vanderhall's incompetent and needed counsel, needed a guardian. So can you point to a statute or a case that says an insurance company has a duty to investigate a claimant's competency? Yes, sir, I can. Not with that level of specificity, but I can tell you what the Doe case said. And this was a case I had in our brief. And they made explicit what had only been implicit before, and this is a Doe versus South Carolina medical malpractice, 557 Southeast 2nd, 674. They said if an insurer can demonstrate bad faith or unreasonable action by an insurer in processing a claim under their mutual binding insurance contract, he can recover consequential damages in a tort action. Implicit in the holding is the extension of a duty of good faith and fair dealing in the performance of all obligations. It seems to follow up on Judge Floyd's question. Every time you posit a duty, you raise an insurance cost and you raise premiums. And particularly the duty that you posit here is a very litigious duty. How far does a duty extend? What constitutes sufficient notice? What constitutes incompetence, which is always a question of degree? In other words, you've not only posited a duty, you've posited a very vague sort of duty, and an investigative duty that's going to raise premiums and probably result in insurers snooping around behind the plaintiff's lawyer and digging in to the plaintiff's or to the insurer's private affairs. You normally, in dealings of this sort, respect the fact that someone is represented and not go behind a lawyer's back. And it's a very basic maximum practicing law. And when going behind a lawyer's back involves invasions of privacy on the part of the insured fishing out medical records and the like, all the while raising premiums substantially, I just don't see it. But, Your Honor, that concern in my mind, assuming that we're asking them to do something new, where we have affidavits in the record that this is what they are, in fact, already doing, that they do investigate a claimant's mental competency once they have noticed that there's an issue that competency is in play. That's from Stuart Setcavage, a former South State Farm Claims Litigation Team Manager, and from Carl Pierce, an insurance defense attorney with 30 years' experience down in Charleston, South Carolina. And those are not opinions on what State Farm should do. Those are opinions on what State Farms and the others in the industry are, in fact, doing now. So all the calls for premiums and litigations and snooping, they're already doing that. And, Your Honor, I don't believe it's snooping. You're asking us to take judicial notice of something that's really not in the record. Your Honor, those affidavits are in the record. Those are expert affidavits that are in the record. They're paged in the record at 468, paragraphs 11 through 12, and 478, paragraph 10, that there is a duty to investigate once they have reason to investigate. That's what they're already doing. The second issue, though, and what may be throwing Your Honor off because it threw me off, is that it's almost like State Farm wants to apply the one-bite rule. It's the old, when you have an animal, he's got to bite one person to hurt one victim first before they have to exercise reasonable care after. That's never been South Carolina law. Going back to that Doe decision, in that Doe decision, the court made a point to note that their research had not uncovered any case dealing with a limited issue before them, yet they still applied the duty of good faith because it was an obligation that the insurance company undertook. And then they examined whether or not the insurance company acted reasonably. And that's all we're asking for here, was for State Farm to act reasonably. All the arguments that they're raising to argue that they did not have a duty, in my mind, basically boil down to them saying what we did was reasonable. And that's fine, but it's just that that's a jury issue. Let me ask you this question. Under the first settlement agreement, you basically agreed that they would confess judgment, assign you their rights against State Farm, and that you, in turn, would agree to never try to get any money from them. Correct. It's a somewhat illusory settlement from the perspective of the driver and owner here. And then I understand your claim of damage, even assuming we agreed to create this new obligation on an insurer. Your theory of damage is that that was such a good deal because it protected the injury to your, to Wilson, for example, the injury to Wilson that you're suing on behalf of, the injury there was that that settlement was a really good deal for him because nobody was ever going after him to collect that $7 million.  But then the prejudgment, pre-verdict, you enter into these settlement agreements, that being the ones we began discussing, pre-jury verdict, in which you do the same thing, right? So you say, again, Mr. Wilson, and the same thing to Ms. Ford, but let me just use Mr. Wilson. Mr. Wilson, whatever happens at this trial, you agree not to appeal and all these sorts of things, but most importantly, at no point will the plaintiff, just like the previous settlement agreement, will the, no point will the plaintiff ever seek to enforce collection of any judgment against the defendant, against Mr. Wilson. Correct. So in both scenarios, whether the old settlement was good or the new settlement was good, Mr. Wilson's in the same shoes, right? That number, whether it's $7 or $75 million, you all have agreed and are bound by the fact that you can't go get it from Mr. Wilson at all. Correct, Your Honor. So what is the injury in fact? What is the injury that you're suing them? Your Honor, I ask you that you please take a look at the Fowler v. Hunt decision from our South Carolina Supreme Court, because that changed the law a little bit from the Fourth Circuit's prior prediction about these kind of deals. Fowler v. Hunt blessed a deal just like we have here, where you would get a covenant not to sue in exchange for the assignment. I'm accepting that the deal is okay. What I'm saying is why is Mr. Wilson any different based on your alleged breach of the duty, right? You weren't going after his assets before. You're not going after his assets now. He's no different. But because the agreement was reasonable and not collusive. That's what the Fowler v. Hunt decision turns on. I'm assuming that they're not collusive. I'm assuming they're good agreements because, you know, your opponent didn't challenge it. I'm looking at the two agreements. Both agreements say, Mr. Wilson, whatever happens here, be it a confession of judgment for $7 million or a verdict of $75 million, you are not financially at risk, right? Correct. But again, Your Honor, the Fowler v. Hunt decision lets the assignment of the bad faith action go forward against the insurance company based on what would have happened absent the settlement agreement. But you're not – this isn't a bad faith claim. This is a negligence claim, right? So there's a duty. It's both. But not what's on appeal. What's on appeal right now is the negligence claim. This is the third cause of action. Both, Your Honor. I appealed the good faith finding, too. There was no deal. Focus on the negligence claim, which is where we've been talking. All right, so the negligence claim is a duty, right? And you say the duty is State Farms got to get in contact with your client without talking to you. Whatever that duty is, right, there's a breach of that duty because they didn't go research the plaintiff enough. And an injury, right? And so what I'm trying to figure out is on behalf of Mr. Wilson, which you're suing on behalf of, what is Mr. Wilson's injury? Because before he had a $7 million verdict against him that you could not collect on. He now has a $75 million verdict against him that you cannot collect on. He's in the same boat. But what he assigned, Your Honor, was the difference between the $70.5 million judgment that was entered against him minus the $7 million peace of mind he had. And, again, it really – That can't be the difference because neither of those were enforceable against Mr. Wilson. You couldn't get $7 million or $75 or $750. Your Honor, Fowler v. Hunt, please. I believe that Fowler v. Hunt addresses this precise issue. And does Fowler address the scenario where the plaintiff disclaims any ability to recover any money from the defendant? Exactly. It does. That's a covenant not to – I mean a covenant not to enforce the settlement. That was the deal there. It was the same issue where the insured was not – when his personal assets were not at stake, and yet they assigned those rights. And it's the same issue you're quizzing me about, Your Honor, is that technically they said there could be no damages in that circumstance. And that's what emanated the Fourth Circuit's prediction of South Carolina law. It's just that the South Carolina Supreme Court disagreed and said that – and it blessed these kind of deals that we did here, each one. The difference is that with the $7 million first settlement, Mr. Wilson had that peace of mind. And that peace of mind got lost because the settlement was void because of that incapacity. But he got it back with disagreement, no? He got it back with disagreement, yes. But what he got back and assigned to us was the ability to sue on that loss. That was a covenant not to sue, Fowler v. Hunt. I know it's cited in my reply brief, but I didn't cite it in the opening brief. Thank you. Mr. Quigley. Thank you, Your Honor. May it please the Court. The appellant correctly stated the law during its first appeal, their first appeal to this Court, when they said, and I quote from page 218 and 219 of the record, quote, When you're talking about mental capacity to contract, that is a subjective concept that seeks to get into the mind of the person contracting. South Carolina law gives all of us a presumption to contract. And there are cases that we have cited that have found folks that are retarded. The 1969 case, I think it's Humboldt Oil that we cited in our brief, talked about a person who contracted who, quote, who was mentally retarded from birth, who had dropped out of school in the fifth grade, etc. Cases have found people who are in an insane asylum have capacity to contract. Cases have found people that have been adjudged to be incompetent have the capacity to contract. Because capacity changes from person to person and from contract to contract. And we've also cited cases that say because of that, the person best able in many cases to evaluate a person's ability to understand a contract is an attorney, particularly where the attorney is present when the person enters into that contract. And here, Mr. Hatfield was present when the contracted issue, this first settlement agreement, was explained to Mr. Vanderhall by Mr. Hatfield and was signed by Mr. Hatfield on Mr. Vanderhall's half. Now, I direct the court to the Avant v. Johnson case we cited, the Parker v. Marco case we cited. We cited other cases where a court weighed on one hand medical testimony that said we think person X doesn't have the capacity to contract. And on the other hand, there was an attorney who was there and said I was there and I think she understood it. And the courts usually side with the attorneys. And if an attorney's determination of his own client's capacity to contract is the best evidence of that capacity, and we cannot rely on that evidence, we can rely on nothing. And I point out that the evidence they point to in this case, that Mr. Vanderhall was slightly mentally retarded, that he had slight brain damage. This information was made known in the previous case to Judge Gergel, but also to Judge Ford and Judge Winn and Judge Thacker. And they all relied on the fact that, you know, this is a subjective concept. This attorney has brought this case on Mr. Vanderhall's behalf and believes him competent to contract. He was there when the settlement agreement was signed. Now, the problem is if you can't rely on an attorney, you can't rely on anything. You can't rely on the plaintiff to say I have capacity. You can't rely on his mother, who in this case said Mr. Vanderhall could make important decisions for himself. You can't rely on anything. And the only thing it leaves you with is going to seek judicial intervention. And, you know, Judge Gergel said that if he were to sign with the plaintiff, it could result in somebody seeking a judicial determination of competency in every case. And if you look at the ways competency has been challenged, I mean, Title 62 of the South Carolina Code says that competency or incompetency can result from, quote, advanced age. It has been challenged based on mental illness, the use of drugs, illegal and legal, and it would affect a vast variety of cases going forward. I think another concern that Judge Gergel did not address but is something that we should be concerned with is that's looking towards the future. But what about in the past? Has Mr. Hatfield, with this duty, provided a road map for cases that have been litigated and settled and resolved to rise from the grave? Because somebody says, well, I had advanced age or I was, you know, my high school records were poor. And they get an affidavit from their attorney that says I didn't look at their high school records. And, you know, they can bring these cases back from the grave. As Judge Wilkinson said earlier, there would be litigation lined up outside the door in that case. Mr. Hill mentioned the expert affidavits. First of all, we've set a law that an expert affidavit cannot create a duty that doesn't exist. And Trotter v. State Farm is one of those cases. But the other thing is these affidavits don't address the facts in this case. The affidavits just talk about a duty to investigate. And that's it. They don't address a situation where the plaintiff's counsel has determined his client to be competent, where the plaintiff's counsel has sat with his client and signed the agreement saying that his client understood the settlement agreement. And the other issue is if the attorney who controls the access to his client believes his client has capacity. Well, the only way to get information is through that attorney. And in this case and in the previous case, Mr. Hatfield thought, he said, that Judge Gergel, in his words, scolded him for having a client without capacity. Now, that's not what happened. But he thought that he'd been scolded for not having a guardian ad litem. And in that case, he didn't get a guardian ad litem. He didn't go look at high school records. He didn't do anything else. And to suggest that he didn't do that stuff when Judge Gergel, he thought, raised the issue, but he would do it if it was raised by State Farm is absurd. So that would leave State Farm with having to go to a court and say, would you please investigate Mr. Vander Hall's competency? But in South Carolina, as I mentioned, number one, a person has a presumption of capacity. Number two, someone challenging capacity has the burden of proving a capacity. And then number three, the best evidence is Mr. Hatfield himself. So the expert affidavits don't and can't address how this could be investigated any further under these facts. The facts of this case, I'd like to mention that Judge Gergel pointed out the hidden or subtle nature of Mr. Vander Hall's incapacity. It was unknown to Mr. Hatfield, who'd been representing injured parties for 35 years. It was unknown to the two witnesses who saw them execute the settlement agreement. It was unknown to Mr. Vander Hall's mother. It was unknown to Mr. Hill. It was unknown to the life care planner, who had been a nurse for 34 years and went and met with Mr. Vander Hall and interviewed him and took his concerns and put them on the life care plan. She didn't raise any issue about his incapacity. Mr. Hatfield and Mr. Hill made 12 different representations to this court last time. The question you always have in any reliance case, whether the issue is one of reliance, is just one of reasonableness. Was the reliance reasonable? And if this wasn't reasonable, I don't know where we are. That's right, Judge. There have to be some clear markers as to what's reasonable reliance. Whether it's an accusation of fraud or whatever it is, there have to be clear markers of reasonable reliance. As Judge Gergel pointed out, here you have one of the clearest markers of all, and that is an unambiguous statement from Mr. Hatfield. And his client is confident. There's no bad faith on the part of any insurer here. There's no cap to skirt the law or do anything untoward. That's right, Your Honor. You guys are playing by the book. You're playing by the rules. In fact, Judge, the settlement issue, the result of that was a $7 million suit, a $7 million judgment that everybody knew would be a case against State Farm. And so that was the settlement. That's not putting State Farm's interests ahead of the insurer's. And then State Farm litigates that case for two years, wins, and then has to start all over at square one under this new theory. So that is in bad faith. It's not putting the insurer's interests in front of the insurer's. Thanks, Carl. I'm happy to address any questions you all have. Thank you. Thank you, Judge. Just a few points, Your Honor. First, Judge Richardson, that Fowler v. Hunt, I missed it. It's actually Fowler v. Hunter. It's on page one of our reply. Is it three? I just read it. Second, Your Honor, the clear representations from Mr. Hatfield is actually from me because I wrote the brief, were made in 2015. The settlement that we were talking about was made in 2013. I'm not sure how they could rely on something said in 2015 to justify behavior in 2013. Next, this is the first case. I mean, Judge Floyd, you asked me if there was a South Carolina case on this. I couldn't find any case from anywhere where an insurance company was entitled to rely on anything a plaintiff's lawyer said about his plaintiff's condition. I couldn't find a case from anywhere which allowed an adversary to justifiably rely on what opposing counsel said or did. What I did find was that- What about all the criminal cases where we have said repeatedly that the district court is entitled to give great weight and heavy reliance upon the defense attorney's representation or view of the competency of their own client. Not maybe exclusive weight, and maybe it can be overcome, but certainly this court has said in a variety of criminal cases that a district court can rely upon the representations of defense attorneys about their clients, right? Yes, sir. And if the court does that and relies on it, I'm not here, because that's classic judicial estoppel. That's classic judicial estoppel where the court relies on it, and now we're talking about the integrity of the court and whether the court can rely on it. I understand judicial estoppel, but what I'm saying is if it's reasonable for a district court to rely upon counsel's belief of the perception? I don't believe so, Your Honor. Why not? Not if they're on notice that they need to double check. And one of the things I wanted to follow up, Judge Wilkinson, about your concern about opening floodgates or something you had said earlier in another argument in a different case, what we have here was their actual notice that this gentleman was mentally retarded, secondary to an injury, or an actual notice that he intended to settle without a guard. And our argument is it's not that they have to do anything extraordinary. We're asking for the very reasonable step that they send an interrogatory. Were there any mental evaluations or assessments on these? Were there any records? Send us the records. And had they done that, it would have picked up those school records that he had extremely low intellectual function. And then they would know. The best notice is that courts attach importance to attorney-client relationship. They do it in the criminal context that he mentioned. There's no reason that they shouldn't do it in the civil context as well. The attorney-client relationship occupies a unique, and I should say hallowed, position in the law. And this is just trying to impinge a relationship and encourage insurance companies to go behind the back of lawyers. That's not a good idea because you've been in practice long enough One of the things you do when you're negotiating and working out a bargain or something, you don't go behind the back of a lawyer and start communicating with the client directly. It's just not done. It's not professional. These people acted in a professional way in relying upon the client's designated representative. And insurance companies sometimes try to cut corners, but sometimes they also turn very square corners. And here we have a boy scout. Here we have a good actor. These folks are above board. What else would you have them do? I would have had them send an interrogatory asking if there were any mental assessments associated with their actual notice that they've been mentally retarded since birth. I'm not asking anybody to snoop, go behind anybody's back, Your Honor. I'm asking them to send an interrogatory asking for that information, followed up by a production request asking for the records. Your Honor, they're already doing this. Our affidavit suggests that, and it was already in the records, too. Thank you. Thank you, Your Honor. Appreciate your time. Adjourned court. I'm going to come down and bring counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Henry F. Floyd, Julius N. Richardson